IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | I N D I C T M E N T |
| v. | Case No. _____ |
| JOSEPH A. KOSTELECKY | Violation:  18 U.S.C. § 981(a)(1)(c) and 1343; 15 U.S.C. §§ 78j(b) and 78ff(a); and 28 U.S.C. § 2461 |

The Grand Jury Charges:

## I.     RELEVANT PERSONS AND ENTITIES

### A. Poseidon Concepts Corporation

1.     Poseidon Concepts Corporation was a Canadian oil and gas services company based in Calgary, Alberta.  Poseidon Concepts Corporation conducted business in the United States through its wholly owned subsidiary, Poseidon Concepts, Inc., a Delaware corporation, which had its corporate headquarters in Denver, Colorado (collectively, "Poseidon").  Poseidon's employees in the United States worked at the company's corporate headquarters in Denver and at a field office in Dickinson, North Dakota.

2.     Poseidon's common stock was traded publicly in Canada and listed on the Toronto Stock Exchange.  Poseidon's stock was sold and purchased in the United States through "Over The Counter" transactions.  The stock traded in the United States under the ticker symbol "POOSF" and was a security pursuant to 15 U.S.C. § 78c(a)(10).

3.     In connection with Poseidon's listing on the Toronto Stock Exchange, Poseidon filed periodic reports containing the company's financial statements with the

Alberta Securities Commission, and it also published financial information on Poseidon's company website. Through its financial reporting and public statements, including press releases, Poseidon disclosed its financial information to Poseidon's shareholders and the investing public.

4. Poseidon's financial statements reported $41,116,000 in quarterly revenue for the three months ending on September 30, 2012 ("Q3 2012") and $148,120,000 in total revenue for the first nine months of 2012. During the same period, Poseidon's shares had a market capitalization of approximately $1 billion. For the first nine months of 2012, approximately 87% of the company's revenues were generated in the United States.

### B. The Defendant

5. From in and around November 2011 to in and around December 2012, Defendant **JOSEPH A. KOSTELECKY**, a resident of Dickinson, North Dakota, served as Poseidon's sole executive officer in the United States. From in and around November 2011 to in and around May 2012, **KOSTELECKY** served as Senior Vice President. In and around May 2012, **KOSTELECKY** was promoted to Executive Vice President, a position that he held until on or about January 10, 2013, when he ultimately resigned from the company. During his employment with Poseidon, **KOSTELECKY** worked at the company's headquarters in Denver, Colorado and at its field office in Dickinson, North Dakota.

### C. Nature of Poseidon's Business

#### Supply of Storage Tanks in the United States

6. Poseidon's principal business in the United States was the supply of above-ground fluid-storage tanks to oil and gas companies engaged in hydraulic fracturing. Hydraulic fracturing is a process in which fluids and chemicals are injected into rocks below the Earth's surface at high pressure in order to create fractures that facilitate the extraction of oil or natural gas. Most fracturing jobs could be completed within a period of several weeks, at which point there was no further need for a fluid-storage tank on site.

7. In connection with a typical drilling operation, oil and gas companies often required large-capacity reservoirs to hold the fluid used to fracture rock, and Poseidon marketed its technology as an innovative and environmentally sound alternative to in-ground wells. Poseidon supplied the tanks to its customers through rental agreements, and it generated revenues from these arrangements.

#### Marketing of Potential Agreements for Tank Rentals

8. **KOSTELECKY** personally, and at times with others acting under his direction and control, marketed to potential and existing customers Poseidon's above-ground storage tanks. In addition, **KOSTELECKY** personally, and at times with others acting under his direction and control, negotiated the associated revenue arrangements with Poseidon's customers.

9. Poseidon's customers sometimes agreed to rent tanks on a short-term basis—often times for only a few weeks—until a particular fracturing operation was completed. In this context, the customers could agree to pay Poseidon a daily rate for the

rental of a tank that would be filled and used at a drilling site on a limited basis, and the daily rate then could be discounted if the customer agreed to use the tank over a longer period of time. Other customers altogether declined to rent any Poseidon tanks. Virtually no customer ever agreed, either verbally or in writing, to any long-term tank rental with Poseidon, meaning a tank rental that lasted for more than one year.

Recording of Revenue for Tank Rentals

10.     In his role as the only senior executive in the United States, **KOSTELECKY** oversaw Poseidon's accounting operations in Denver and directed the accounting staff to book revenue generated from purported tank rentals in the company's accounting records.

11.     Poseidon had in place a revenue-recognition policy that governed how management and the accounting staff were to recognize revenue from tank rentals. This policy required, among other things, persuasive evidence of an arrangement with a customer and a reasonable assurance of collectability. Before revenue could be recorded properly in Poseidon's accounting records, staff typically requested documentation from Poseidon sales representatives, including **KOSTELECKY**, to support each entry.

12.     The documentation requested by accounting staff could take several forms, but it generally reflected some evidence of a customer commitment. At a minimum, accounting staff sought to obtain confirmation by a customer authorizing specific tank services in the field, usually by way of a field ticket signed by a customer representative. In order to book any long-term arrangement, accounting staff typically requested a fully executed agreement to support such contract revenue. This agreement ordinarily set forth

the terms and conditions of the rental and made clear that the customer was committing to a long-term service.

13.     Many of Poseidon's customers or potential customers had in place a master services agreement or "MSA."  The MSA outlined general conditions of the parties' relationship, such as invoicing requirements and liability coverage, in order to lay the groundwork for the possibility of future work.  The MSA was not a tank-rental agreement, and the MSA did not commit the customer to any tank rental.

Reporting of Revenue from Tank Rentals

14.     Poseidon's consolidated financial statements combined the financial results of the parent company and its holdings.  The consolidated balance sheet, income statement, and cash-flow statements thus reflected Poseidon's activities in both Canada and the United States.  The overwhelming majority of Poseidon's revenue stemmed from its operations in the United States, which was comprised largely of the tank-rental business.  During the first three quarters of 2012, the proportion of revenues attributable to operations in the United States was as high as 94%.

## II.     THE SCHEME TO DEFRAUD

### A.  Overview of the Scheme

15.     From at least in and around November 2011 and continuing into in and around December 2012, the exact dates being unknown to the Grand Jury, **KOSTELECKY** devised, intended to devise, and executed a scheme to defraud the investing public by falsely inflating Poseidon's reported revenue by tens of millions of dollars.

### B. Purpose of the Scheme

16. The purpose of the scheme was for **KOSTELECKY** to inflate the value of Poseidon's revenue and stock price by making false and misleading pretenses, representations, and promises about Poseidon's true financial condition, and to enrich **KOSTELECKY** through the continued receipt of compensation and appreciation of his own Poseidon stock and stock options.

### C. Execution of the Scheme

#### Fraudulent Directives Regarding the Recording of Revenue

17. Despite knowing that customers either had not committed to using Poseidon tanks at all or had committed to using them for only a limited period of time, **KOSTELECKY** routinely instructed accounting staff to recognize false revenue that purportedly related to long-term rental contracts. When accounting staff would ask **KOSTELECKY** for documentation to support the various revenue and invoices, **KOSTELECKY** would give explicit directions to staff regarding what revenues to record and falsely assure them that signed contracts existed, or that booking was appropriate even in the absence of signed contracts. As a result of his directives, the accounting staff booked revenue and billed customers for tanks or for periods of time to which the customers never had agreed, in violation of Poseidon's own accounting policies and procedures.

18. For example, on May 23, 2012, a clerk in Poseidon's accounting staff asked other staff and in-house counsel for copies of tank-rental agreements to support outgoing invoices that **KOSTELECKY** directed her to send: "I'm hoping you can help me out.

I'm trying to locate all of the current contracts so we can invoice for them.  I really only need the first 3 pages that have the dates, tanks, amounts and the effective dates of each contract."  The next day, after another member of the accounting staff copied **KOSTELECKY** and suggested that the clerk contact **KOSTELECKY's** assistant in Dickinson for such contracts, **KOSTELECKY** responded and instructed the clerk, "Why are we waiting on this?  Invoice off what I have provided you!!"

<u>False Assurances Regarding the Collectability of Revenue</u>

19. By at least the second quarter of 2012, Poseidon's management had grown concerned about the increasingly large and aged receivables from contract revenue and pressed **KOSTELECKY** regarding its collectability.  **KOSTELECKY** made continued false assurances to Poseidon's Controller and company executives regarding the existence and collectability of long-term contract revenue.

20. On August 24, 2012, for example, after repeated efforts to obtain from **KOSTELECKY** the purported contracts to support the booked revenue, the company's Controller specifically asked him, "The crux of the matter Joe, is do we have signed contracts (lease agreements, term sheets) to validate what we are billing on these contracts?  I see some on the server but they do not equate to what we have been billing on the majority of these contracts."  The Controller then expressed his reservations about the continued revenue booking in the absence of supporting documentation: "I don't feel like it [is] appropriate to book any of these old adjustments (or even going forward existing contract revenue) until finance has . . . something on file, executed by the customer to denote that they are obligated to pay for tanks."  **KOSTELECKY** thereafter

7

responded, providing false assurances about having signed contracts on file when, in fact, he knew that they did not exist: "There are only 3 vendors all which are small that do NOT have a signed contract!! And I would argue the fact that 'the majority' using your words, of agreements do not equate." **KOSTELECKY** then confirmed to the Controller, "[W]e have all documentation."

### The Impact of the Scheme upon Poseidon's Financial Statements and Revenue Growth

21.　During 2012, Poseidon issued and published three sets of quarterly financial statements, as follows:

22.　On May 9, 2012, Poseidon issued its unaudited interim condensed consolidated financial statements for the three months ending on March 31, 2012 ("Q1 2012"), reporting revenues of $52,129,000. Of the Q1 2012 revenues, approximately 81% purportedly were generated in the United States.

23.　On August 8, 2012, Poseidon issued its unaudited interim condensed consolidated financial statements for the three and six months ending on June 30, 2012 ("Q2 2012"), reporting revenues of $54,875,000 for Q2 2012 and $107,004,000 for the first six months of 2012. Of the Q2 2012 revenues, approximately 94% purportedly were generated in the United States.

24.　In its last public filing on November 14, 2012, Poseidon reported Q3 2012 revenues of $41,116,000 for Q3 2012 and $148,120,000 for the first nine months of 2012. Approximately 85% of the Q3 2012 revenues purportedly were generated in the United States.

25.     In each quarter of 2012, Poseidon's reported revenue included large accounts-receivable balances and extraordinary increases in revenue over the same period in the previous year.  Q1 2012 revenues represented a 460% increase over the same period in the previous year.  Q2 2012 revenues represented a 568% increase over the same period in the previous year, and the six-month-period revenues represented a 510% increase over the first six months of 2011.  Q3 2012 revenues represented a 171% increase over the same period in the previous year, and the nine-month-period revenues represented a 329% increase over the first nine months of 2011.

26.     But Poseidon's revenue growth as reported in its financial statements was not driven by any corresponding growth in Poseidon's tank-rental business.  Instead, such growth was caused by **KOSTELECKY's** fraudulent directives to book revenue for customers that had not agreed to long-term tank rentals and his false representations and assurances that the large and aged accounts-receivable balance remained collectable.

### Concealment of the Fraud

27.     As part of and in furtherance of the scheme, **KOSTELECKY** repeatedly undertook efforts to conceal the fact that millions of dollars of purported contract revenue did not exist or was not collectable.  For example, **KOSTELECKY** instructed accounting staff to refrain from calling certain customers about outstanding invoices, telling them that he would be the only Poseidon contact to handle the account.  Similarly, **KOSTELECKY** at times directed staff not to mail out certain customer invoices at all, instructing them instead to book the revenue even in the absence of a billing.  In addition, **KOSTELECKY** blamed others for invoicing errors, relying upon such errors as an

excuse for why customers were not paying.  During this period, **KOSTELECKY** continued to falsely represent that the long-term contract revenue was supported by signed contracts and collectable.

### D. The Victims

28. During 2012, Poseidon's stock had more than 81 million shares outstanding.  Approximately 29% of the total shares were owned by investors in the United States, including investors in North Dakota.

29. Between November 14, 2012 and February 15, 2013, Poseidon informed the investing public that much of its previously reported revenue was not collectable. During this same period, Poseidon's common stock lost 98.6% of its value, falling from $13.10 per share to $0.18 per share.

30. On February 14, 2013, Poseidon issued a press release advising that the board of directors preliminarily had determined the following in relation to booked contract revenue:

   a. "Approximately $95 million to $106 million . . . of the [c]ompany's $148.1 million in revenue for the 9 months ended September 30, 2012 should not have been recorded as revenue in the [c]ompany's financial statements";

   b. "[A]pproximately $94 million to $102 million . . . of the [c]ompany's $125.5 million accounts receivable as at September 30, 3012 should not have been recorded in the Company's financial statements as accounts receivable"; and

    c. "As a result of the foregoing, the first, second and third quarter 2012 financial statements . . . will be restated and the [c]ompany advises investors that they should no longer rely on the [f]inancial [s]tatements."

31. On or about May 17, 2013, Poseidon's stock was delisted from trading on the Toronto Stock Exchange.

### III.    THE CHARGES

#### COUNTS 1 THROUGH 5
#### Wire Fraud (18 U.S.C. § 1343)

32. Paragraphs 1 through 31 of this Indictment are realleged and incorporated by reference as a description of the scheme and artifice to defraud.

33. From at least in and around November 2011 and continuing to at least in and around December 2012, the exact dates being unknown to the Grand Jury, in the District of North Dakota and elsewhere, Defendant **JOSEPH A. KOSTELECKY** did knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice.

## PURPOSE OF THE SCHEME AND ARTIFICE TO DEFRAUD

34.     The Grand Jury realleges and incorporates by reference paragraph 16 of this Indictment as a description of the purpose of the scheme.

## THE SCHEME AND ARTIFICE TO DEFRAUD

35.     The Grand Jury realleges and incorporates by reference paragraphs 17 through 27 of this Indictment as a description of the scheme.

## USE OF THE WIRES

36.     On or about the dates specified as to each count below, in the District of North Dakota and elsewhere, Defendant **JOSEPH A. KOSTELECKY**, for the purpose of executing the aforesaid scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, as more particularly described below:

| Count | Approximate Date | Description of Wire Communication |
|---|---|---|
| 1 | May 21, 2012 | Electronic mail sent by **KOSTELECKY** to Poseidon employee |
| 2 | May 24, 2012 | Electronic mail sent by **KOSTELECKY** to Poseidon employee |
| 3 | July 13, 2012 | Electronic mail sent by **KOSTELECKY** to Poseidon employee |
| 4 | August 24, 2012 | Electronic mail sent by **KOSTELECKY** to Poseidon employee |
| 5 | November 2, 2012 | Electronic mail sent by **KOSTELECKY** to Poseidon employees |

All in violation of Title 18, United States Code, Section 1343.

## COUNT 6

### Securities Fraud
### (15 U.S.C. §§ 78j(b) and 78ff(a);
### Title 17, Code of Federal Regulations, Section 240.10b-5)

37. Paragraphs 1 through 31 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

38. From at least in and around November 2011 and continuing to in and around at least December 2012, the exact dates being unknown to the Grand Jury, in the District of North Dakota and elsewhere, Defendant **JOSEPH A. KOSTELECKY** did willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, in connection with the purchase and sale of securities, use and employ manipulative and deceptive devices and contrivances in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business that operated and would operate as a fraud and deceit upon purchasers of Poseidon's stock, to wit, **KOSTELECKY** made and caused to be made false and misleading representations to the investing public about Poseidon's revenue and financial condition.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5.

## FORFEITURE ALLEGATION

39. As the result of committing the offenses of wire fraud and securities fraud, in violation of Title 18, United States Code, Sections 1341 and 1343; Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5; and, as alleged in Counts One through Six of this Indictment, Defendant **JOSEPH A. KOSTELECKY** shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(c), and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Six of this Indictment.

### Substitute-Asset Provision

40. If any of the above described forfeitable property, as a result of any act or omission of the defendants:

    1)     cannot be located upon the exercise of due diligence;

    2)     has been transferred or sold to, or deposited with, a third person;

    3)     has been placed beyond the jurisdiction of the Court;

    4)     has been substantially diminished in value;

    5)     or has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1)

and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

                    A TRUE BILL:

                    /s/ Foreperon
                    Foreperson


ANDREW WEISSMANN
Chief
Fraud Section, Criminal Division
U.S. Department of Justice


By:   /s/ Anna G. Kaminska
       Anna G. Kaminska
       Henry Van Dyck
       Trial Attorneys
       Fraud Section, Criminal Division
       U.S. Department of Justice